Filed 10/22/24  Hart v. Hart CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| BETH MAE HART,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>ROBERT HART, Individually and as Trustee, etc.,<br><br>    Defendant and Appellant. | F086566<br><br>(Super. Ct. No. VCU286706)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Tulare County.  Bret D. Hillman, Judge.

Robert Hart, in pro. per., for Defendant and Appellant.

Williams, Brodersen, Pritchett & Ruiz and Steven R. Williams for Plaintiff and Respondent.

-ooOoo-

This is an appeal from an order granting a motion to amend a judgment that added a new judgment debtor. Appellant and defendant Robert Hart (appellant) contends that the trial court erred by granting respondent and plaintiff Beth Mae Hart's (respondent) motion to add "Robert Hart as trustee" of two trusts to the judgment. Specifically, Appellant avers the court erred by: (1) relying on rulings and findings from a separate unrelated divorce proceeding to apply the alter ego doctrine; and (2) violated trust law to find a unity of interests between Appellant and Robert Hart as trustee. We affirm.

## PROCEDURAL BACKGROUND

On April 15, 2021, respondent filed suit against appellant and his now former wife Elizabeth "Lilly" Hart (Lilly) (collectively "the Harts"). Respondent alleged that appellant and Lilly had unlawfully provided her with a usurious loan.

In June 2022, a trial was conducted, and the jury found in favor of respondent on her claim of a usurious loan. In part, the jury found that respondent paid approximately $27,000 in interest on the usurious loan, which was credited against the principal. The court subsequently awarded respondent approximately $70,000 in attorney fees.

On March 3, 2023, respondent filed a motion to amend the judgment to add codebtors. The motion sought to add appellant in his capacity as a trustee of the Old Oak Holdings (OOH) trust and in his capacity as a trustee for the North Fork Assets (NFA) trust. Respondent argued that "Robert Hart as trustee" for the two trusts was the alter ego of appellant.

On March 27, 2023, appellant filed a verified opposition to the motion to amend judgment. In connection with appellant's opposition, a declaration by appellant's son Jason Hart (Jason) was filed on April 4, 2023. Jason declared that he was a beneficiary of the NFA, OOH, and Cedar Grove Holdings (CGH) trusts, which were established by his grandmother, and that appellant was not the alter ego of the trusts.

On May 12, 2023, respondent filed an amended motion to amend the judgment to add codebtors. The motion sought to add appellant in his capacity as a trustee for the

2.

OOH trust and in his capacity as a trustee for the CGH trust. Respondent argued that "Robert Hart as trustee" of these two trusts was the alter ego of appellant.

On May 29, 2023, appellant filed a verified opposition to respondent's amended motion.

On June 27, 2023, the trial court held a hearing on the motion to amend judgment. The court granted respondent's motion.

On June 30, 2023, the clerk issued a new abstract of judgment. Two additional defendants were added to the judgment: the NFA trust and the CGH trust.

On July 18, 2023, appellant appealed the trial court's order amending the judgment.

## FACTUAL BACKGROUND

### The Ketter Trusts

Sometime prior to the events of this appeal, Appellant's mother Beverley Jean Ketter created the CGH, OOH, and NFA trusts. Jason is the beneficiary, and the Harts are cotrustees, of each of the three trusts. The three trusts each have a single parcel of real property as an asset. The CGH trust has a parcel known as the "Dry Creek Property," which was acquired in November 2019; the OOH trust has a parcel known as the "Three Rivers Property," which was acquired in January 2007; and the NFA trust has a parcel known as the "Dahlem Property," which was acquired in December 2007.

### Loan to Respondent & Corresponding Lawsuit

In March 2016, the Harts loaned respondent $29,000 to stop a foreclosure. The interest rate charged was 1.5 percent per month, or 18 percent annually, for a period of five years.

In March 2018, respondent's attorney informed appellant that the loan violated the California Constitution's provision against usurious loans. The Harts responded by demanding that respondent's lawyer prove that the private loan was subject to the California Constitution. Respondent's lawyer did not reply.

3.

In February 2021, respondent sent appellant a series of checks related to the loan. Appellant did not cash the checks, but subsequently did offer to retroactively reduce the interest from 18 percent per year to 10 percent per year.

In April 2021, respondent brought suit against the Harts. Respondent prevailed at trial, and a judgment in her favor was entered on June 3, 2022.

### *Divorce Proceedings*[1]

Appellant and Lilly divorced after the trial on respondent's usury claim. Relative to this appeal, there are several important aspects of the divorce proceedings.

#### Lilly's Request for Property Control

On February 15, 2022, Lilly filed a request for a court order that would place her in control of the Dry Creek Property. In support of this request, Lilly declared in part that this property was purchased by her and appellant using community property funds from her work as a dance instructor and appellant's contracting and home inspection business. The Dry Creek Property was used as a profitable AirBNB rental since its acquisition in 2019 and was their main source of income. Lilly was concerned about losing the

---

[1] Pursuant to Evidence Code sections 455 and 459, we gave the parties notice of, and an opportunity to object to, our intention to take judicial notice of appellant's trial brief, Lilly's trial brief, and three documents submitted in connection with Lilly's "Request for Property Control," all of which are part of the record in *In re Marriage of Hart*, case No. F086051. Appellant timely filed objections in which he argued that we may not take judicial notice of facts in the record or consider settlement related information for the purposes of assessing the trial court's alter ego finding. However, we are taking judicial notice of the existence of the documents and not treating factual assertions as true, (*People v. Franklin* (2016) 63 Cal.4th 261, 280; *In re Vicks* (2013) 56 Cal.4th 274, 314), and the documents at issue were not a part of any settlement proceeding and they are not being considered for an improper settlement related purpose under Evidence Code sections 1152 and 1154. (*Hasler v. Howard* (2004) 120 Cal.App.4th 1023, 1026.) Therefore, we overrule Appellants' objections and take judicial notice of these appellate court records. (Evid. Code, §§ 452, 459; *Kinney v. City of Corona* (2023) 99 Cal.App.5th 1, 13, fn. 6.)

AirBNB income and that appellant was incapable of running the property as an AirBNB rental.

On March 4, 2022, appellant filed an opposing declaration. In part, appellant declared a family trust owned the Dahlem Property and a family trust owned the Dry Creek Property. Appellant also declared that "all real property is owned by family trusts and no real property are marital assets." Appellant further declared that all real estate was purchased by trust assets that were themselves acquired through smart real estate investments by the family trusts. Appellant asserted that "[a]ll real property acquired during our marriage is owned by family trusts," and that the real properties "have never been marital assets." Appellant declared that he played a key role in the property's success as an AirBNB rental and that the income from the rental was a trust asset but did not deny that the rental income was their main source of income.

On March 22, 2022, Lilly filed a reply declaration that in part identified a number of ways in which the CGH trust failed to comply with the California Probate Code. Lilly also declared that Beverly Ketter was destitute and contributed nothing towards the acquisition of any real estate. Lilly declared that the true settlors of the CGH trust were the Harts and all assets held by the CGH trust were community property.

**Appellant's Trial Brief**

On December 2, 2022, appellant filed a trial brief in preparation for a division of property hearing. In part, the trial brief stated that he and Lilly were cotrustees of multiple family trusts. Under a section entitled "Settled Issues," appellant stated that he would resign as cotrustee of the NFA trust, Lilly would be the sole trustee of the NFA trust, Lily would resign from the CGH trust, and appellant would be the sole trustee of the CGH trust. Under a section entitled "Issues To Be Litigated At Trial," appellant identified the following issues: (1) the worth and equal split of a trust asset, the Three Rivers Property owned by the OOH trust, in which the Harts were cotrustees; (2) the equal split of the value of the Dahlem Property owned by the NFA, in which the Harts

5.

were cotrustees; and (3) the equal split of the value of the Dry Creek Property owned by the CGH trust, in which the Harts were cotrustees. Finally, under a section entitled "[Appellant's] Proposal of Resolution of Issues," appellant addressed the Dahlem and Dry Creek Properties. With respect to the Dahlem property, appellant proposed that he would resign as cotrustee of the NFA trust, Lilly would be the sole trustee, and Lilly would have the right to "transfer assets into other trusts or name different beneficiaries if desired," and appellant would no longer have any rights to the trust or trust property. With respect to the Dry Creek Property, appellant proposed that Lilly would resign as the cotrustee of the CGH trust, appellant would be the sole trustee, and appellant would have the right to "transfer assets into other trusts or name different beneficiaries if desired," and Lilly would no longer have any rights to the trust or trust property.

### Lily's Trial Brief

Lilly filed a trial brief on December 6, 2022. In part, Lilly represented that the parties had placed a stipulation on the record in March 2022 regarding the real properties at issue. The stipulation represented that the Dahlem Property was confirmed to Lilly, the Dry Creek Property was confirmed to appellant, and the Three Rivers Property would be sold with the proceeds divided and equalized per a final division. Under a section entitled "Community Property Assets and Debts," Lilly's brief identified: the Dahlem Property and noted that it was confirmed to her, the Dry Creek Property and noted that it was confirmed to appellant, and the Three Rivers Property and noted that the Harts had agreed to sell the property and divide the proceeds.

### Final Division and Distribution of Property Hearing

On December 16, 2022, the divorce court held a recorded hearing regarding the division and distribution of the Harts' marital property. The distribution hearing appears to have been preceded by five days of argument and evidence. At the distribution hearing, the court stated that it would "make findings on the record." The court noted that the case was difficult because the Harts chose to conduct almost all of their financial

affairs outside the "traditional banking and taxation system." The court noted that the Harts both listed "unknown" as the last date they filed tax returns and operated "their businesses through a series of opaque trusts – we've heard testimony about that – and holding their assets and vehicles in trusts so that their names weren't on them." The court noted that Lilly said the "scheme" was utterly fraudulent, while appellant indicated it was because they did not trust banks, but it was "pretty clear to the [c]ourt that the primary function here is to avoid federal and state taxation." The court also noted an unknown "real property transfer" that could have been, but was not, done as a "1031 exchange." Similarly, at another point in the hearing, the court explained that it "found essentially that the parties were operating the trusts together as a going community scheme …." The court further noted that "in the past few years," the Harts "primarily gained income from AirBNB rentals," and they "have a fair amount of expertise" with respect to AirBNB rentals.

After discussing money that had been stored in floor safes, the divorce court turned to the Dahlem, Dry Creek, and Three Rivers Properties. The court accepted an appraisal value of $825,000 for the Dahlem Property and an appraisal value of $690,000 for the Dry Creek Property. The court noted that it was "agreed that [the Three Rivers Property] will be listed for sale. And the equalization can be made out of that [sale]."

At one point, appellant asked about equalization and stated, "[t]here's a $135,000 difference between the price of my house and her house." The divorce court responded that the equalization payment would address the difference between the valuations. The following exchange regarding the CGH and NFA trusts then occurred:

"[Appellant]:        I would suggest that she resigns from [CGH], I resign from [NFA] that owns Dahlem. [CGH] owns Dry Creek. If she signs and notarizes a document resigning as the trustee from [CGH] and I resign from [NFA], she will ….

"THE COURT:        That makes sense.

7.

| "[Appellant]: | … she will become controlling trustee of that property, and she can do whatever she wants with it, if she wants to put it in her name or whatever. But I continue, you know … |
|---|---|
| "THE COURT: | "Basically, yes, you each need to be in a position where you control solely the homes you're awarded here. [Lilly] is getting the Dahlem property, and you're getting the Dry Creek property. |
| "[Appellant]: | "Right, but we have to have legal documents so that if somebody wants to sell the property that they're totally in control and they don't need the other party … |
| "THE COURT: | "You should do that, yes. |
| "[Appellant]: | "So would you order that … |
| "THE COURT: | "You know, I think the trusts were a subterfuge. I'm not going to make orders about the trusts. If the properties are held in the trusts and you need to resign, that's something you need to do." |

In the formal judgment, the trial court awarded the Dahlem Property to Lilly as her sole and separate property. The trial court awarded the Dry Creek Property to appellant as his sole and separate property. The Harts were ordered to split the proceeds from the sale of the Three Rivers Property.

***Order Amending Judgment in Usury Trial***

In May 2023, respondent filed a motion and an amended motion to amend the judgment to add as a judgment debtor "Robert Hart as trustee" of the NFA, OOH, and CGH trusts.

On June 27, 2023, the trial court issued an order that granted respondent's motion to amend. After finding that appellant was the same person as "Robert Hart as trustee" and thus, had the opportunity to litigate the dispute with respondent, the court held:

"Further, where 'it's entirely reasonable to ask whether a trustee is the alter ego of a defendant who made a transfer into [the] trust,' it seems equally reasonable for the Court to answer such a question in the affirmative when

8.

the Defendant and trustee of the trusts at issue are one in the same. Some of the property held in trust where Defendant Robert Hart is the trustee that may be subject to the Judgment further were divided by this Court in the dissolution matter and thus appears to be an asset of Defendant Robert Hart, which was held in the trusts. Here, the Court will exercise '… the greatest liberality' in permitting the Judgment to be amended to add an alter ego of Defendant Robert Hart. [Citation omitted]

"In his response, [Appellant] argues that although he is a trustee of these trusts, the trusts predated this dispute and do nothing but hold property for the beneficiaries. He does not name the beneficiaries. The judgment of dissolution in the Hart dissolution does not reference the trusts as viable entities and divides the assets without reference to the trusts.

"The transcript attached to the judgment containing the court's findings after the dissolution trial discusses the court's reasoning in looking through the trusts and treating the trusts' assets as assets of the parties. The findings of the Court were as follows:

"The Court: The parties chose to operate their businesses through a series of opaque trusts … and holding their assets and vehicles in trusts so their names aren't on them. And the Court finds that there's been testimony that one party or the other was trying to do this. I think Mr. Hart probably came up with this scheme. However, I think it was a mutual agreement throughout the marriage and how these parties operated. … Mrs. Hart now says they were utterly fraudulent. Mr. Hart says it was because they didn't trust banks. It's pretty clear to the Court that the primary function is to avoid federal and state taxation.

"A later section of the Court's findings contains the following exchange:

"Mr. Hart:     I would suggest that she resigns from [CGH], I resign from [NFA] that owns Dahlem. [CGH] owns Dry Creek … . If she signs and notarizes a document resigning as trustee from [CGH], and I resign from [NFA], she will …

"The Court:   That makes sense.

"Mr. Hart: … she will become controlling trustee of that property, and she can do whatever she wants with it, if she wants to put it in her name or whatever .…

9.

"After a further discussion of the trust properties, the Court said:

"The Court: You know, I think the trusts were subterfuge. I'm not going to make orders about the trusts. If the properties were held in trusts, and you need to resign, that's something you need to do.

"As the Court in the dissolution action essentially disregarded the trusts and divided the underlying assets, finding them to be a 'subterfuge,' they should not act as a liability shield in this action. Mr. Hart himself disregarded the trust when he engaged in the above discussion, noting that after the co-trustee resigned the [remaining] trustee could 'Do whatever she wants with it, if she wants to put it in her name or whatever ....' That evidence shows an understanding that the trusts are only a vehicle to hold the property that the parties to the dissolution saw as their community property. It would be unjust for these entities to shield property from a lawful judgment rendered by the jury in this action."

## DISCUSSION

### I. Parties' Arguments

Appellant argues that the alter ego finding is improper because there is no evidence that shows a sufficient unity of interests between himself and "Robert Hart as trustee." Appellant argues that the trial court's reliance on statements made by the divorce court during his divorce was inappropriate. Because the comments were not part of a judgment, and the issue of alter ego was not actually decided, Appellant contends that res judicata and collateral estoppel cannot apply. Finally, Appellant argues it is improper to find that "Robert Hart as trustee" is his alter ego when the trusts at issue were established by Appellant's mother for the benefit of her grandson Jason.

Respondent does not expressly address any of Appellant's points and instead submits on the existing appellate record.

### II. Legal Standards

#### A. *Amending a Judgment*

California law provides that "[w]hen jurisdiction is [by law] conferred on a Court or judicial officer, all the means necessary to carry [that jurisdiction] into effect are also

10.

given; and in the exercise of this jurisdiction, if the course of proceedings be not specifically pointed out by [statute], any suitable process or mode of proceeding may be adopted which may appear most conformable to the spirit of [the Code of Civil Procedure]." (Code Civ. Proc., § 187; *Estrada v. Royalty Carpet Mills, Inc.* (2024) 15 Cal.5th 582, 603, fn. 14.) Through Code of Civil Procedure section 187, a court may amend a judgment to add a judgment debtor. (*JPV I L.P. v. Koetting* (2023) 88 Cal.App.5th 172, 188 (*JPV I*); *Wolf Metals Inc. v. Rand Pacific Sales Inc.* (2016) 4 Cal.App.5th 698, 703.) A judgment may be amended to add an "alter ego" as a debtor. (*JPV I*, at p. 189; *Favila v. Pasquarella* (2021) 65 Cal.App.5th 934, 942.) However, before an alter ego may be added to a judgment, due process requires that the additional judgment debtor controlled the litigation in its capacity as alter ego and was thus " ' "virtually represented" ' " in the lawsuit. (*Baize v. Eastridge Companies, LLC* (2006) 142 Cal.App.4th 293, 302; see also *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 509 (*Greenspan*).) "In the interests of justice, the ' " ' "greatest liberality is to be encouraged" ' " ' in the allowance of amendments brought pursuant to Code of Civil Procedure section 187." (*Wells Fargo Bank, N.A. v. Weinberg* (2014) 227 Cal.App.4th 1, 7; see also *Favila*, at p. 937.) A trial court's decision to amend a judgment is reviewed for an abuse of discretion, while the factual findings necessary to the amendment decision are reviewed for substantial evidence. (*Favila*, at p. 943; see *Wolf Metals*, at p. 703.)

## B.  *Trusts*

A trust is not a legal entity, has no capacity to sue or be sued, and does not hold legal title to property. (See *Jo Redland Trust, U.A.D. 4-6-05 v. CIT Bank, N.A.* (2023) 92 Cal.App.5th 142, 156–157 (*Jo Redland Trust*); *Greenspan*, *supra*, 191 Cal.App.4th at pp. 521–522.) Rather, a "trust is a fiduciary relationship with respect to property in which the person holding legal title to the property – the trustee – has an equitable obligation to manage the property *for the benefit of another* – the beneficiary." (*Moeller*

11.

*v. Superior Court* (1997) 16 Cal.4th 1124, 1134 (*Moeller*).)  "When property is held in trust, ' "there is always a divided ownership of property," ' generally with the trustee holding legal title and the beneficiary holding equitable title."  (*Boshernitsan v. Bach* (2021) 61 Cal.App.5th 883, 891; see also *Greenspan*, at p. 522.)  In this regard, the beneficiaries' equitable estate is " ' "regarded as the real owner[s] of [that] property," ' " while the trustee's legal estate is " ' "no more than the shadow … following the equitable estate …." ' " (*Steinhart v. County of Los Angeles* (2010) 47 Cal.4th 1298, 1319 (*Steinhart*).)  A trustee must always act solely in the beneficiaries' interest, and if the trustee violates this duty, he will be liable for breach of trust.  (*Moeller*, at p. 1134.)  The " 'proper procedure for one who wishes to ensure that trust property will be available to satisfy a judgment … [is to] sue the trustee in his or her representative capacity.' " (*Greenspan*, at p. 522.)

**C.     *Alter Ego***

A judgment may be amended to add an "alter ego" as a debtor under the theory that " 'the court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant.' " (*JPV I*, *supra*, 88 Cal.App.5th at p. 189.)  While the alter ego doctrine generally applies to business organizations such as a corporation, it has been applied in the context of trusts.  (*Greenspan*, *supra*, 191 Cal.App.4th at p. 521.)  However, only the trustee of a trust may be an alter ego because the trust itself is not an entity and thus, incapable of being an alter ego.  (*Id.* at p. 522.)  There are two general requirements for establishing an alter ego:  (1) there is such a unity of interests and ownership that the separate personalities of the individual and the entity no longer exist; and (2) an inequitable result will occur if the actions are considered to be those only of the entity.  (*Blizzard Energy, Inc. v. Schaefers* (2021) 71 Cal.App.5th 832, 848–849 (*Blizzard Energy*); *Greenspan*, at pp. 511, 527–529.)  Courts have identified at least 14 nonexclusive factors that may show a sufficient unity of

interests, but no single factor is necessarily determinative, and the ultimate determination depends on the unique facts and circumstances of the particular case. (*Greenspan*, at pp. 512–513; *Zoran Corp. v. Chen* (2010) 185 Cal.App.4th 799, 811–812.) The standards for finding an alter ego are high, and the doctrine is an extreme remedy that is to be used sparingly, reluctantly, and with caution. (*JPV I*, at p. 189.) A court's alter ego finding is reviewed for substantial evidence. (*Blizzard Energy, Inc.*, at p. 848.)

### D. *Issue Preclusion*

The doctrine of issue preclusion or collateral estoppel " 'precludes relitigation of issues argued and decided in prior proceedings.' " (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896; *Williams v. Doctors Medical Center of Modesto, Inc.* (2024) 100 Cal.App.5th 1117, 1131.) In order for issue preclusion to apply, the following elements must be met: (1) the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding; (2) the issue must have been actually litigated in the former proceeding; (3) the issue must have been necessarily decided in the former proceeding; (4) the decision in the former proceeding must be final and on the merits; and (5) the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding. (*People v. Strong* (2022) 13 Cal.5th 698, 716; *Williams*, at pp. 1131–1132; see also *Samara v. Matar* (2018) 5 Cal.5th 322, 327.) The party asserting issue preclusion has the burden of establishing the above elements. (*Strong*, at p. 716; *Williams*, at p. 1132.) A lower court's application of issue preclusion is reviewed de novo. (*Williams*, at p. 1132.)

## III. Analysis

The evidence cited by appellant indicates that the trusts at issue are irrevocable, the settlor of the trusts was appellant's mother, the trustees are appellant and Lilly, and Jason, not appellant, is the beneficiary. Appellant's opposition also indicates that the trusts each contain a single real property parcel. Although appellant asserts that the trusts

own the parcels, that is an inaccurate statement of California law because the trusts cannot own property. (*Jo Redland Trust*, *supra*, 91 Cal.App.5th at pp. 156–157; *Greenspan*, *supra*, 191 Cal.App.4th at pp. 521–522.) Further, under *Steinhart*, appellant, as trustee, merely holds legal title and is not the true owner of any of the trusts' assets.[2] (*Steinhart*, *supra*, 47 Cal.4th at p. 1319.) Instead, the equitable or true owner of the trusts' property is Jason, the beneficiary. (*Ibid.*) Therefore, appellant's evidence leads to the conclusion that adding "Robert Hart as trustee" to the judgment as a debtor permits respondent to satisfy the judgment against appellant with the property of Jason. (See *ibid.*; *Greenspan*, at p. 522.) This result is appropriate only if "Robert Hart as trustee" is in fact the alter ego of Appellant. (*Greenspan*, at pp. 497, 527–528 [remanding matter for the trial court to consider whether the trustee of an irrevocable trust established by the defendant for the benefit of his children was the alter ego of the defendant and thus, could be added as a judgment debtor to an amended judgment].)

Neither the trial court nor respondent pointed to any "external" evidence concerning the creation of the trusts, Jason's interactions with or expectations concerning the trusts, or appellant's actual practices, transactions, oversight, management, or operations concerning the trusts. Instead, respondent and the trial court relied on statements and findings made by the divorce court in order to show a unity of interest and thus, alter ego. Although neither respondent nor the trial court identified the basis for relying on the divorce court's findings and rulings, we believe that the trial court applied

---

[2] We note that grant deeds recorded in the Tulare County Recorder's Office list the names of the trusts, e.g. "North Fork Assets," as the grantee of the real property parcels. However, the records include only the trusts' names and do not actually identify the trusts as "trusts" (or any particular type of entity for that matter). While listing the name of the trust puts a potential buyer on notice that an entity is involved in the ownership of the parcel, the fact remains that a trust is not a legal entity and cannot own real property. (*Greenspan*, *supra*, 191 Cal.App.4th at pp. 521–522.) Therefore, the trusts do not own the parcels despite the Tulare County records. (See *Steinhart*, *supra*, 47 Cal.4th at p. 1319; *Greenspan*, at pp. 521–522.)

issue preclusion from issues decided in the divorce proceeding.[3]  Specifically, the trial court relied on the facts that the trusts were part of a community scheme and that the real property trust assets were actually community property used by the Harts for their own benefit.  We conclude that the court did not err in its application of issue preclusion.

### A.    *Issue Preclusion*

#### 1.    **Elements 4 and 5:  Final Decision and Identical Party**

Appellant was a party to the divorce proceedings, which fulfills the fifth element of collateral estoppel.  Further, although there was an appeal pending with respect to the divorce court's final order of property distribution, that appeal did not raise any issues concerning the divorce court's actions or findings concerning any real property or the NFA, CGH, or OOH trusts.  (See *In re Marriage of Hart* (May 21, 2024, F086051) [nonpub. opn.].)  Because there was no appeal concerning the real property assets at issue, we conclude that the final order of distribution was a sufficiently final decision on the merits for purposes of issue preclusion regarding the real property trust assets.  (See *Meridian Financial Servics., Inc. v. Phan* (2021) 67 Cal.App.5th 657, 688–689 [explaining that, unlike claim preclusion, a final decision for purposes of issue preclusion is one that is " 'sufficiently firm to be accorded conclusive effect,' " meaning that " 'the decision was adequately deliberated and firm, even if not final in the sense of forming a basis for a judgment already entered' "].)

---

[3] Citing *De Cou v. Howell* (1923) 190 Cal. 741, appellant contends that it is improper to consider the statements of the divorce court.  *De Cou* did hold that the "law is definitely settled in this state by a long line of decisions that the opinion of a trial court is not a part of the record and cannot be considered by an appellate court as indicating what operated upon its mind in coming to a conclusion as the ultimate facts of the case." (*Id*. at p. 751.)  However, it is accepted that both oral and written opinions of a trial court may be considered to establish what matters were decided for purposes of issue preclusion.  (See *McClain v. Rush* (1989) 216 Cal.App.3d 18, 28; *Carroll v. Puritan Leasing Co.* (1978) 77 Cal.App.3d 481, 491–492; *Tevis v. Beigel* (1957) 156 Cal.App.2d 8, 14–15.)  Therefore, we consider the statements of the divorce court for purposes of issue preclusion.

## 2. Elements 2 and 3 – Actually Litigated and Necessarily Decided

The filings with respect to Lilly's request for property control show that the status of the trusts and of all real property assets were at issue. Lilly contended that the trusts were shams and that none of the real property assets were purchased or acquired by appellant's mother, rather, all trust assets were obtained with community property and treated as community property by the Harts. Appellant did not directly challenge Lilly's contention that his mother contributed nothing to the trusts, but he did maintain that the trusts were used for typical trust purposes and that none of the real property assets were marital assets, rather they were all nonmarital trust assets.

When Lilly and appellant filed their respective trial briefs, they had been discussing the real property assets. Lilly's trial brief stated that the Dahlem and Dry Creek Properties would be "confirmed" to the parties, while the Three Rivers property would be sold with the proceeds divided between herself and appellant. While appellant's trial brief stated that he and Lilly were cotrustees of multiple family trusts, his brief still agreed that resignations would lead to Lilly being solely in control of the Dahlem Property and appellant being solely in control of the Dry Creek Property. Importantly, appellant also stated that an outstanding issue was the worth and equal split the three real property "trust assets." Appellant also proposed that he and Lilly resign from the NFA and CGH trusts in such a manner that Lilly would have the ability to transfer the NFA's real property asset and assign new beneficiaries if she desired, and that he would have the ability to transfer CGH's real property asset and assign new beneficiaries if he desired.

The representations by appellant in his trial brief are significant because they are inconsistent with the proposition that the real property assets are strictly trust assets and not martial/community property. If the real property assets were not marital/community property, then there would be absolutely no need to split those assets, determine their value or worth, or attempt to split their values between Lilly and appellant. (See Fam.

16.

Code, § 2550; *In re Marriage of Simmons* (2013) 215 Cal.App.4th 584, 593–594 (*Marriage of Simmons*).) Instead, the real property assets would remain in the trusts under the existent beneficial ownership of Jason and would not be subject to any court valuation, assessment of worth, or division. (See *Marriage of Simmons*, at pp. 593–594.)

Appellant's representations are also inconsistent with his role as a trustee for the benefit of Jason. A trustee places the interests of the beneficiary over his own. (*Moeller*, *supra*, 16 Cal.4th at p. 1134.) As a purported beneficial owner of each of the three real property parcels, it is not apparent how it is in Jason's best interest for the Three Rivers property to be sold and for the proceeds to be split between the Harts without Jason receiving any money. It is also unclear how it is in Jason's best interest for the Dahlem and Dry Creek Properties to be valued and awarded to Lilly and appellant as their sole and separate properties, thereby extinguishing Jason's equitable ownership interests. Further, if the trusts are irrevocable, it is not in Jason's best interests for appellant to suggest that Lilly and appellant would have the ability to transfer the Dahlem and Dry Creek Properties and change beneficiaries, which would also extinguish Jason's equitable ownership interests. Similarly, as recognized by the trial court, appellant's suggestion at the division of property hearing that Lilly could do whatever she wanted with the Dahlem Property is inconsistent with the property being a trust asset held for the benefit of Jason. (*Ibid.*)

The divorce court's property division order was generally in alignment with the parties' trial briefs. The divorce court ordered the Three Rivers Property sold and the proceeds divided between Lilly and Appellant, awarded the Dry Creek Property to appellant, and awarded the Dahlem Property to Lilly. The specific language of the division of property order was that the Dry Creek Property was appellant's "sole and separate property," and the Dahlem Property was Lilly's "sole and separate property." The plain meaning of this phraseology is that the Dahlem Property belongs completely to Lilly as her own property, and the Dry Creek Property belongs completely to appellant as

17.

his own property. The order is wholly inconsistent with the notion that the real property assets were nonmarital trust assets being held and maintained for the benefit of Jason. Further, as part of the basis for the property distribution, the divorce court valued the Dahlem and Dry Creek Properties and used those valuations as part of the division and equalization process between Lilly and appellant. Again, if the Dahlem and Dry Creek Properties were not martial assets but were instead trust assets being held and maintained for the benefit of Jason as the existent equitable owner, then their valuations would not be part of the marital estate and would not be subject to division and equalization as between Lilly and appellant. (See *Marriage of Simmons*, *supra*, 215 Cal.App.4th at pp. 593–594.)

When the divorce court specifically addressed the trusts, it expressly found that the trusts were part of a community scheme, i.e. a scheme agreed to and implemented by both Lilly and appellant during marriage, to avoid tax liability on their own income. Further, when appellant suggested to the divorce court at the division of property hearing that Lilly as the sole trustee of NFA could sell or do whatever she wanted with the Dahlem Property, the divorce court refused to make orders regarding the trusts because they were a subterfuge, meaning that they were not actually used or managed in a way that was for the benefit of a beneficiary. In other words, the divorce court described and treated the trusts as a tool that was being used for the benefit of the community as part of a marital/community scheme.

Collectively, the filings in the divorce proceedings show that there was a dispute about the status of the trusts and the real property assets held by the trusts. The parties engaged in discussions, reached agreements on key issues, and made suggestions to the divorce court on other issues. Those agreements and suggestions are inconsistent with the proposition that the trusts' real property assets were being held and maintained for the benefit of Jason as the equitable owner. The divorce court reviewed the submissions of the parties and made orders consistent with the parties' agreements. The divorce court viewed the trusts as vehicles that were used for the benefit of the Harts and to avoid

18.

paying taxes, refused to treat the trusts' assets as assets equitably owned by Jason as beneficiary, and made orders that were only consistent with the conclusion that the trusts' assets were marital/community assets. The filings of the parties and the findings and order of the divorce court therefore demonstrate that the nature of the trusts and the trusts' assets was actually litigated. Further, because the divorce court is required to divide community property between the spouses (Fam. Code, § 2550), it was necessary to determine how the Harts' treated the trusts and trusts' assets. If the Harts had not used the trusts to hold community property and as part of a community scheme for their own benefit, then the trusts' assets would be nonmarital/noncommunity property and not subject to division. Therefore, it was necessary for the divorce court to determine the nature and use of the trusts and the trusts' assets. Accordingly, the nature of the trusts and the proper characterization of the real property trust assets were necessarily decided and actually litigated in the divorce proceeding.

### 3. Element 1 – Identical Issues

In applying the alter ego doctrine, the trial court relied on the divorce court's findings and treatment of the trusts as part of a community scheme and the real property trust assets as community property (that was divided between appellant and Lilly) in finding a unity of interests. Therefore, the nature of the trusts and the trusts' assets were key issues in both this usury trial and the divorce proceeding.

### 4. Conclusion

Because all five elements of issue preclusion are met, appellant is estopped from contending that the real property assets of the NFA, CGH, and OOH trusts were not marital/community property or that the trusts at issue were not used as part of a community scheme for the benefit of the community.

### B. *Alter Ego*

The divorce proceeding demonstrated that the Harts lived at the Dahlem Property and rented out the Dry Creek Property as a profitable AirBNB rental. Lilly's motion for

19.

control of the Dry Creek Property alleged that the Harts lived off of the AirBNB rental income generated by the Dry Creek Property, and Appellant did not deny the assertion. The Harts used the trusts as part of a community scheme to avoid paying taxes on their income. Further, as martial/community properties, the Dahlem and Dry Creek Properties were assets that belonged to the Harts and inured to their benefit. (See William W. Bassett, Cal. Community Property Law, § 1:22 (2023–2024 ed.) ["The basic presumption of the community property system is that both husband and wife are equally owners of the community property … regardless of contribution. … Since 1975, husband and wife have had equality in the management and control of the community, a truly equal partnership"].) This means that, despite the existence of the trusts and Jason as a beneficiary, the trust properties were maintained by martial/community property assets, were used for the benefit and support of both Lilly and appellant, and were actually treated by Lilly and appellant as marital/community assets.

This is similar to the circumstances in *Greenspan* in which the defendant funded a trust for the benefit of his children, appointed a third-party trustee, and then controlled the actions of the trustee to use the trust assets for his own purposes and benefit. (*Greenspan*, *supra*, 191 Cal.App.4th at pp. 497, 527–528.) It is true that the *Greenspan* court did not remand the matter with instructions for the lower court to grant the motion to amend based on an alter ego theory. Instead, *Greenspan* remanded the matter for the lower court to reconsider the alter ego issue in light of evidence that had been wrongly excluded. Despite not ordering the lower court to grant the motion to amend, *Greenspan* strongly suggests that the regular use of trust assets by one who contributed or fully provided trust assets for that person's own interests, and acts in an apparent disregard of the beneficiary's interests, are factors that can strongly point to a unity of interests and thus, alter ego.

We recognize that alter ego is a doctrine that is to be applied with great caution. (*JPV I*, *supra*, 88 Cal.App.5th at p. 189.) Nevertheless, given the nature of the trust

assets as marital/community property, the use of the trust assets for the benefit of the Harts, and the divorce court's conclusion that the use of the trusts was part of a scheme to avoid tax liability, we conclude that substantial evidence supported the trial court's implicit finding that there was a unity of interests between appellant and "Robert Hart as trustee" and its express finding that "Robert Hart as trustee" is the alter ego of appellant. (*Blizzard Energy*, *supra*, 71 Cal.App.5th at p. 848.)  Consequently, the court was well within its broad discretion to amend the judgment to include "Robert Hart as trustee" as judgment debtor.  (*Favila v. Pasquarella*, *supra*, 65 Cal.App.5th at p. 943.)

## DISPOSITION

The trial court's order amending judgment is affirmed.  Respondent shall recover costs on appeal.


POOCHIGIAN, J.

WE CONCUR:


HILL, P. J.


LEVY, J.

21.